UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| THE LAFAYETTE LIFE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff | ) ) | |
| vs. | ) ) | CAUSE NO. 4:10-CV-26 RM |
| ARCH INSURANCE COMPANY, | ) ) | |
| Defendant | ) | |

OPINION AND ORDER

Lafayette Life Insurance Company insured its agencies through an insurance policy issue by Arch Insurance Company. Lafayette Life contends that Arch breached the insurance contract by refusing to defend or indemnify a series of lawsuits filed against Lafayette Life for alleged wrongdoing by Lafayette Life agent Gerald Kloppe. Lafayette Life seeks partial summary judgment and, for the reasons that follow, the court grants that motion in part.

I

Summary judgment, of course, should be granted when the admissible evidence, construed in favor of the non-movant, reveals no genuine issue as to any material facts and establishes that the movant is entitled to judgment as a matter of law. If there is sufficient evidence for a jury to return a verdict for the non-moving party, a genuine issue of material fact exists. . . . It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders.

Berry v. Chicago Transit Auth., 618 F.3d 688, 690-691 (7th Cir. 2010) (citations omitted).

This contract dispute between a life insurance company and its Errors and Omissions (malpractice) insurer originates in the wrongful actions of an insurance agent, Gerald Kloppe. Mr. Kloppe is said to have deceived dozens of people into spending a lot of money to swap or buy life insurance policies by (1) making false and misleading statements concerning the nature and benefits of the policies; (2) representing the policies as investments; (3) representing that the policies' premiums would vanish after several years; and (4) representing that the policies would allow the policyholders' wealth to grow in a tax-free environment and would be a source of equity for personal loans. Mr. Kloppe first contracted with Lafayette Life in April 2006. Before that, he sold policies for Amerus Life Insurance Company (now Aviva) from 2000 through at least January 4, 2006 (Amerus terminated Mr. Kloppe sometime in 2006). Mr. Kloppe is the only connection in the record between Amerus and Lafayette Life.

On March 1, 2008, Lafayette Life obtained an Errors and Omissions insurance policy from Arch Insurance Company for the period March 1, 2008 - March 1, 2009. The E&O policy was renewed for March 1, 2009 through March 1, 2010. Counsel represent that Lafayette Life had its E&O insurance with Zurich American Insurance Company before the Arch policy. No connection exists in the record between Zurich and any other corporate or personal name in the record. The Arch policy is a "claims made" policy that covers malpractice claims first made against the insured and reported to Arch during the policy period. Mr. Kloppe was an Insured under the Policy and Lafayette Life was a Sponsoring Company.

2

Lafayette Life began to receive policyholder complaints about agent Kloppe's deceptive sales practices shortly after the inception of the Arch E&O Policy. Complaints rolled in over the next few months—in all, twenty-one policyholder claims were made to Lafeyette Life arising from agent Kloppe's conduct.[1] In September, Lafayette Life informed Arch about ten claims (Chart, Claims 1-10). Arch immediately acknowledged receipt of the forms and informed Mr. Kloppe that it was reviewing the matters.

Attorney H. Mitchell Baker has represented all relevant policyholders claiming misconduct by Mr. Kloppe. Attorney Baker says he has represented fifty-two clients against Mr. Kloppe and his employers, including Amerus and Lafayette Life. Mr. Baker and his clients allege the same misconduct by Mr. Kloppe in all 52 claims. Shortly after Lafayette Life forwarded those first ten claims to Arch, attorney Baker wrote to Lafayette Life to say he was preparing demand packages for the ten claims. A month later, Mr. Baker mailed a formal demand letter to Lafayette life for eleven claims (a new claim was added in the interim).[2] The demand letter indicates that Mr. Baker had been representing clients who took out policies through Mr. Kloppe since 2005. It alleges that after Amerus terminated Mr. Kloppe, Mr. Kloppe convinced his existing clients to replace their Amerus policy with a similar policy from Lafayette Life. The letter contains a

---

[1] For ease of reference, the court attaches an appendix chart listing and summarizing details about these claims.

[2] See the attached appendix. Claims 1-10 were forwarded to Arch on September 11, 2008. Claims 1-11 were included in Mr. Baker's October 21, 2008 demand letter.

significant allegation of direct wrongdoing by Lafayette Life:

> A member of upper management at Lafayette either became aware or should have been aware that Jerry Kloppe was "twisting" his existing clients with Amerus into new policies with Lafayette. A simple phone call would have revealed the numerous complaints filed against Mr. Kloppe with the various state agencies. An internal decision must have been made in the underwriting department to ignore the obvious misconduct of Mr. Kloppe and write new life insurance policies without concern for the financial ability of the individuals to pay for the policies.

The letter includes specific allegations of Mr. Kloppe's deceptive practices and refers to Lafayette Life's statutory liability for Mr. Kloppe's actions under agency principles.

Lafayette Life forwarded this demand letter to Arch several days later. Crossing paths with the notice of demand letter, Arch responded to Lafayette Life at the end of October about one of the first ten claims (J. Difloure, Chart Claim No. 4), saying that Arch previously had received fourteen complaints concerning Mr. Kloppe and Amerus Life Insurance Company. Arch acknowledged valid notice of the matter but said it would likely deny indemnity and defense coverage based on the Policy's vicarious liability provision and based on the Policy's Exclusions A and C.

Regarding the vicarious liability provision, two of the Policy provisions were at issue:

> § I.C. INSURING AGREEMENTS — Vicarious Liability
> The insurer shall pay on behalf of the Sponsoring Company all Loss which the Sponsoring Company shall become legally obligated to pay because of a Claim first made during the Policy Period ... solely arising out of a Wrongful Act of an Agent ... solely in the rendering or

4

failing to render Professional Services. The Wrongful Act must be attributable solely to an Agent in the rendering or failing to render Professional Services and not due to any actual or alleged independent wrongdoing or bad faith of the Sponsoring Company.

§ II. Defense and Settlement
The Insurer shall have the right and duty to defend any Claim against the Insured seeking sums payable under this Policy, even if the allegations of the Claim are groundless or false. … If a Claim made against the Sponsoring Company includes both covered and uncovered allegations, the Sponsoring Company and the Insurer agree to use their best efforts to agree upon a fair and proper allocation of the payment of Loss and Defense Costs for such Claim.

Arch didn't mention the defense and settlement provision, but instead further stated that coverage would also likely be denied under two Exclusion provisions:

§ IV. Exclusions
This Policy does not apply to any Claim:

A. based upon, arising out of or in any way involving any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a direct or indirect renewal or replacement or which preceded this Policy;

C. based upon, arising out of or in any way involving any prior or pending litigation against any Insured filed on or before the inception date of this Policy or under any other policy of which this Policy is a renewal, whichever is earlier, or the same or substantially the same fact, circumstance or situation underlying or alleged therein; …

Arch took the position that because "this lawsuit" (the J. Difloure claim) was related to matters previously reported to Arch under a different policy (American Automobile Insurance Company policy no. 8-17 ME07318199), Exclusion A precluded coverage. AAIC is a subsidiary of Fireman's Fund Insurance Companies. No evidence in the record suggests any connection between AAIC / Fireman's Fund and Lafayette Life. Arch also said the claims coming from multiple directions

about Mr. Kloppe's conduct were all interrelated and involved matters pending before the Lafayette policy's March 1 inception date, so Arch said it likely would also deny coverage under Exclusion C.

Arch responded to the notice of attorney Baker's demand letter in mid-November by denying E&O coverage for all eleven claims (Chart, Claims 1-11). Arch acknowledges this was a "formal denial." Arch stated that "[s]ince there are independent allegations of wrongdoing against Lafayette Life and the alleged Wrongful Acts are not solely attributable to Agent, there is no vicarious liability coverage for Lafayette Life." Arch didn't mention the Defense and Settlement provision of the Policy, nor did it mention Exclusions A and C as formal reasons for denial of coverage.

Lafayette Life responded by downplaying the allegation of direct wrongdoing by Lafayette Life and by asserting that the Defense and Settlement provision took precedence and required Arch to investigate and defend all allegations of vicarious liability regardless of whether they are mixed with direct claims. Lafayette Life also stated that Exclusion A requires a degree of sameness that didn't exist between the AAIC / Amerus claims and the Lafayette claims. Lafayette Life also asked Arch to inform them of what litigation they contend precludes coverage under Exclusion C.

Arch soon responded by maintaining the same position concerning the vicarious liability provision and arguing that the whole claim in the demand letter was directed solely at Lafayette Life, rendering the Defense and Settlement

language in the Policy moot. Arch also clarified its position by saying "any lawsuit filed against [Mr. Kloppe] would relate back to litigation filed before the inception date of this Policy and tendered to Mr. Kloppe's prior carrier." Arch attached an August 1, 2006 letter about claims of misconduct by Mr. Kloppe made to AAIC. Arch rested that argument on the definition of Related Claims:

> § III.O: Related Claims means all Claims, whether made against more than one Insured or by more than one claimant, arising out of a single Wrongful Act or Wrongful Supervision or Termination Act or a series of Wrongful Acts or Wrongful Supervision or Termination Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

The only time the term Related Claims appears in the Policy is in the section regarding liability limits:

> § V.B. Related Claims: All Related Claims shall be deemed a single Claim, subject to a single Each Claim Limit of Liability, if covered, and such Claim shall be considered first made on the date of the earliest such Related Claim is first made against an Insured, regardless of whether such date is before or during the Policy Period.

After this second formal denial (and third indication of denial from Arch), Lafayette Life informed Arch that it had no choice but to defend and settle the Claims made. Lafayette Life indicated it would proceed with the understanding that Arch was waiving its rights to control the litigation, including the right to approve settlement. Arch never responded.

Lafayette Life ultimately handled twenty-one claims concerning Mr. Kloppe's conduct. Twelve claims (including the eleven already discussed) comprised a formal lawsuit filed on February 18, 2009. Though Lafayette Life forwarded the

twelfth claim (Chart, Claim 12) involved in that lawsuit to Arch in November 2008, Arch never responded to that claim. Lafayette Life settled those twelve claims (Chart, Claims 1-12) from March 10-12, 2009, by refunding premiums to policyholders. The complaint filed by Attorney Baker omitted the detailed allegations of Lafayette Life's wrongdoing that were included in the October 2008 demand letter and instead mostly focused on Mr. Kloppe's wrongful conduct and vicarious liability. Arch says it never saw a copy of the North Carolina lawsuit complaint until Lafayette Life filed suit against it more than a year later in March 2010.

Nine more claims are at issue (Chart, Claims 13-21). Arch took no action on eight of those claims (Chart, Claims 13-20), and issued a denial letter for the ninth claim (Chart, Claim 21) on March 1, 2010 by re-asserting its position noted before and further asserting that an intervening Endorsement No. 8 to the contract prohibited coverage for the actions of Mr. Kloppe. Lafayette Life settled these nine claims by refunding premiums, but did so before ever notifying Arch of these nine claims' existence.

II

Lafayette Life claims that Arch's refusal to defend and indemnify breached the E&O Policy contract and that Arch committed tortious bad faith in doing so. Lafayette Life seeks a declaratory judgment that it is entitled to defense and indemnity coverage from Arch, and damages. Lafayette Life's partial motion for

summary judgment seeks only a decision that Arch breached the contract, so the court doesn't consider Lafayette Life's claim of tortious bad faith, nor does the court address damages at this time.

A

Lafayette Life filed its motion for partial summary judgment two days after Arch filed its answer. Arch filed a Rule 56(f) motion seeking a 120-day continuance to conduct the discovery needed to respond to Lafayette Life's motion. Arch sought discovery that, in sum, would determine what Lafayette Life knew and when it knew it about agent Kloppe. Arch represented that the discovery it sought would allow it to "fully evaluate and respond to plaintiff's allegations of liability for breach of contract." Arch's motion admitted it didn't know if Exclusions A and C applied and that Arch needed the 120-day continuance to discover the facts needed to justify its denial of coverage. Arch asserted that these documents were only in Lafayette Life's possession. Magistrate Judge Cherry granted Arch's Rule 56(f) motion. Arch ultimately ended up with not 120 days but 150 days to conduct its discovery.

Arch's summary judgment response includes a general objection to Lafayette Life's summary judgment motion on the basis that more discovery is needed. Arch argues that the case's procedural posture indicates there must still be a material issue of fact precluding summary judgment because discovery isn't complete. This isn't so. Arch presumably denied insurance coverage because it

thought it had a factual basis for doing so. Arch represented to the court that 120 days would be enough to discover documents justifying its denial of coverage, and it ultimately was granted 150 days. Arch's general objection doesn't indicate what specifically it still is looking for or how long its search for evidence would take. Rule 56(f) requires such specificity. *See* <u>First Nat'l Bank and Trust Corp. v. American Eurocopter Corp.</u>, 378 F.3d 682, 693 (7th Cir. 2004) ("Under Rule 56(f), '[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.' The Inlow Estate did not submit such an affidavit to the district court."); *see also* <u>Davis v. G.N. Mortgage Corp.</u>, 396 F.3d 869, 885 (7th Cir. 2005) ("The only reason to believe that additional, relevant evidence would materialize from deposing the defendants' employees is the Davises' apparent hope of finding a proverbial 'smoking gun' . . . . This, however, is based on nothing more than mere speculation and would amount to a fishing expedition, which is an entirely improper basis for reversing a district court's decision to deny a Rule 56(f) motion.").

B

The parties agree that Indiana law governs the interpretation of their contract. Indiana's Supreme Court nicely summarized Indiana's rules of insurance

contract interpretation:

> Contracts for insurance are subject to the same rules of interpretation as are other contracts. Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence, and if reasonably intelligent persons may honestly differ as to the meaning of the policy language, the policy is ambiguous. Ambiguities are construed strictly against the insurer to further the general purpose of the insurance contract to provide coverage. Interpretation of the contract should harmonize its provisions, rather than place the provisions in conflict. Terms are to be given their ordinary and generally accepted meaning.

Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d 243, 246-247 (Ind. 2005) (citations and quotations omitted). Clear and unambiguous language is given its plain and ordinary meaning. Buckeye State Mut. Ins. Co. v. Carfield, 914 N.E.2d 315, 318 (Ind. Ct. App. 2010); Allstate Ins. Co. v. Burns, 837 N.E.2d 645, 651 (Ind. Ct. App. 2005); *see also* Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d at 247 (using standard dictionary to determine meaning of the word "repair" rather than turning the word into a legal term of art).

Mere controversy doesn't establish ambiguity; ambiguity is established "only if reasonable persons would differ as to the meaning." Allgood v. Meridian Sec. Ins. Co., 836 N.E.2d at 248.

The effort to interpret contract provisions in harmony means, in part, that courts "must interpret the language of a contract so as not to render any words, phrases, or terms ineffective or meaningless." Bowen v. Monroe Guaranty Ins. Co., 758 N.E.2d 976, 980 (Ind. Ct. App. 2001); *see also* Buckeye State Mut. Ins. Co. v. Carfield, 914 N.E.2d at 318 ("When interpreting an insurance policy, our goal

is to ascertain and enforce the parties' intent as manifested in the insurance contract. . . . We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs."); Allstate Ins. Co. v. Burns, 837 N.E.2d at 651 ("The contract must be read as a whole and the language construed so as not to render any words, phrases, or terms ineffective or meaningless.").

Coverage exclusions must be expressed plainly, and in cases of doubt or ambiguity exclusion clauses are construed against the insurer and in favor of coverage. Allstate Ins. Co. v. Burns, 837 N.E.2d 645, 651 (Ind. Ct. App. 2005) ("When insurance policies are interpreted, this court has determined that exceptions, limitations and exclusions under such contracts must be plainly expressed in the policy."); Erie Ins. Co. v. Adams, 674 N.E.2d 1039, 1041 (Ind. Ct. App. 1997) ("[E]xceptions, limitations and exclusions must be plainly expressed in the policy . . . and any doubts as to the coverage shall be construed against the contract drafter."); Evans v. Nat'l Life Accident Ins. Co., 467 N.E.2d 1216, 1219 (Ind. Ct. App. 1984) ("An exclusion will be given effect only if it unmistakably brings the act or omission within its scope."); *see also* Allstate Ins. Co. v. Boles, 481 N.E.2d 1096, 1098 (Ind. 1985) (stating "plainly expressed" exclusions are enforceable).

C

1

Lafayette Life quotes the § II Defense and Settlement provision of the Policy to argue that the Policy requires Arch to use its "best efforts" to split costs with Lafayette Life if a claim "includes both covered and uncovered allegations." Lafayette Life contends that Arch has a duty to defend even if a claim involves allegations of direct wrongdoing by Lafayette Life. Arch responds that because the Baker demand letter alleged independent wrongdoing by Lafayette Life, coverage was precluded under the vicarious liability provision, which provides for coverage only if an agent is solely responsible for wrongdoing.

Before Lafayette Life filed this lawsuit, Arch told Lafayette Life that the claims in the Baker demand were, in whole, against Lafayette Life as the direct wrongdoer, rendering the defense and settlement provision moot. Arch made no reference to the defense and settlement provision in its summary judgment response brief. Arch now argues before the court that Lafayette Life settled the twelve claims from the North Carolina lawsuit without ever forwarding a copy of the complaint to Arch. Arch turns the argument away from the defense and settlement provision and says that whether Arch would have defended the claims if it had known of the North Carolina lawsuit containing vicarious liability claims is purely conjecture.

Arch's reading of the interplay between the vicarious liability and defense and settlement provisions would render the defense and settlement provision meaningless and in conflict with the vicarious liability provision. Arch's only argument concerning the defense and liability provision was made to Lafayette Life

and not this court, and the argument then was that the provision was moot because of the contents of the Baker demand.

The Baker demand contained serious accusations about Lafayette Life's conduct. This is unsurprising given Mr. Baker's understanding that North Carolina law makes a principal liable for its agent's aggravated misconduct if it condones and approves of such misconduct, and that such a finding would increase the damages owed to his clients. But the demand letter also lodges pointed and serious accusations against Mr. Kloppe himself, and a plain reading of the letter indicates an additional theory of recovery under vicarious liability. As Mr. Baker wrote, "Agency is established by statute as it concerns any representation or sale of life insurance." Arch's argument to Lafayette Life that the defense and settlement provision was rendered moot ignored the vicarious liability implications in the demand letter.

By its plain meaning, the vicarious liability provision provides payment for loss solely due to an agent's conduct and prohibits coverage for Lafayette Life's own wrongdoing. But by its plain meaning, the defense and settlement provision requires Arch to defend claims and split costs with Lafayette Life when claims include wrongdoing by Lafayette Life. As the Policy is written, the duty to defend provision anticipates and accepts the possibility of direct claims of wrongdoing, and the vicarious liability provision serves to limit Arch's liability after Arch has defended. Under the Policy, the duty to defend takes precedence over the duty to pay and a premature denial of one's duty to pay improperly makes meaningless

one's duty to defend.

What happened between Lafayette Life and Arch illustrates why the duty to defend must take precedence lest coverage also prove to be illusory. Attorney Baker lodged serious accusations against Lafayette Life, which are unsupported by anything in the record before this court. Attorneys and clients have every reason to leave every possible claim open as a theory of recovery until it's safe to close the door on those possibilities. Indiana law prohibits illusory insurance coverage, meaning a policy that won't pay benefits under any reasonably expected set of circumstances. <u>Lexington Ins. Co. v. Am. Healthcare Providers</u>, 621 N.E.2d 332, 339 (Ind. Ct. App. 1993). To deny coverage simply because someone makes allegations of direct wrongdoing is to render coverage illusory because it's unreasonable to expect plaintiffs to limit allegations to claims already proven before a suit is filed.

Arch breached the contract by its blanket denial of defense and indemnification. Arch had a duty to defend the claims made and it breached that duty. Arch's reading of the contract would render the defense and settlement provision meaningless and out of harmony with the vicarious liability provision, and would render contracted-for insurance coverage illusory. Indiana law prohibits such interpretations of contracts.

2

Arch tries to broaden the scope of Exclusions A and C by arguing that all

claims involving Mr. Kloppe are "Related Claims" because they involve the "common nexus" of Mr. Kloppe's deceptive salesmanship. Arch tries to use the Related Claims definition to tie the Lafayette Life claims to the Amerus, North Carolina Department of Insurance and all other complaints about Mr. Kloppe's conduct that may have arisen before the policy's March 1 inception date. Lafayette Life argues that the Related Claims definition doesn't apply because complaints made to the North Carolina Department of Insurance in 2006 weren't "Claims" within the meaning of the Policy and didn't become "Claims" within the meaning of the Policy until the filing of the Amerus lawsuits beginning with the <u>Minson</u> suit on Feburary 22, 2008, which Lafayette Life maintains wasn't served until after March 1, 2008.

The Policy defines "Claim" as a written demand for monetary damages, a civil proceeding, or an arbitration. The definition in § III.F expressly excludes administrative proceedings from the definition. Nothing indicates that the 2006 Department of Insurance claims were anything more than an administrative proceeding, so those 2006 claims weren't "Claims" within the meaning of the Policy.

More fundamentally, Exclusions A and C don't use the defined term "Related Claims," so that term's definition doesn't apply to the reading of Exclusions A and C. A basic principle of contract interpretation is that the court will apply definitions for defined terms, but undefined terms will be given their plain, ordinary meaning. *See* <u>Allgood v. Meridian Sec. Ins. Co.</u>, 836 N.E.2d 243,

246-247 (Ind. 2005) ("Terms are to be given their ordinary and generally accepted meaning."); *see also, e.g.*, <u>Provident Life and Acc. Ins. Co. v. Knott</u>, 128 S.W.3d 211, 219 (Tex. 2003) ("When terms are defined in an insurance policy, those definitions control the interpretation of the policy."); <u>Overton v. Consolidated Ins. Co.</u>, 38 P.2d 322, 327 (Wash. 2002) ("Courts interpreting insurance policies should be bound by definitions provided therein."); <u>Kitsap County v. Allstate Ins. Co.</u>, 964 P.2d 1173, 1178 (Wash. 1998) ("If terms are defined in a policy, then the term should be interpreted in accordance with that policy definition. Undefined terms, however, must be given their 'plain, ordinary, and popular meaning.'"); <u>State Farm Mut. Auto. Ins. Co. v. Ballmer</u>, 899 S.W.2d 523, 526 (Mo. 1995) ("If a term within an insurance policy is clearly defined, the contract definition controls."). A contract's definitions apply only when the defined term is actually used; when undefined terms are used they are given their plain and ordinary meaning.

Like most contracts, this Policy contains a definitions section. "Related Claims" is a defined term, and like other defined terms in the Policy, "Related Claims" appears in bold and capital letters when used. The term "Related Claims" is used only in § V.B of the Policy, but that section isn't at issue here. The court reads the terms of Exclusions A and C as written, according to their plain meaning, and without any added interpretive gloss provided by the Policy's definition of "Related Claims" or any other definitions for terms not actually used in the exclusions.

Exclusion A states:

> This Policy does not apply to any Claim based upon, arising out of or in any way involving any fact, circumstance or situation which has been the subject of any written notice given under any policy of which this Policy is a direct or indirect renewal or replacement or which preceded this Policy.

Arch denied coverage under Exclusion A because of an August 1, 2006 letter from Lancer Claims Services to Mr. Kloppe about six claims made to the North Carolina Department of Insurance, in which American Automobile Insurance Company (a subsidiary of Fireman's Fund Insurance Companies) agreed to defend the claims. Arch argues that those 2006 Department of Insurance claims are "related" to the Lafayette Life claims because they involve the same type of conduct by the same agent.

As just noted, the court doesn't follow the definition for "Related Claims" provided in the contract because that term is a defined term that doesn't appear in the Exclusion. The court interprets Exclusion A according to its plain language.

Arch's argument omits any reference to the "direct or indirect renewal or replacement or which preceded this Policy" language. That language can't be ignored or it would be rendered meaningless. That language provides a mechanism for showing that Lafayette Life knew or should have known of Mr. Kloppe's conduct through prior written notice given under a policy preceding the Arch E&O Policy. The only policy on the record that preceded the Arch E&O Policy is the Zurich E&O Policy. The summary judgment record contains no evidence that any written notice was given under the Zurich E&O Policy of agent Kloppe's

conduct.

The essence of Arch's argument is that because Mr. Kloppe engaged in his malfeasance for a period of time before the March 1, 2008 inception date of the Arch E&O Policy, Lafayette Life knew or should have known of Mr. Kloppe's conduct. Arch argues that the August 1, 2006 letter, though completely unrelated to Lafayette Life or Zurich, creates an inference that this is so. That argument ignores the language of Exclusion A and relies on metaphysical doubt about Lafayette Life's conduct, which isn't sufficient to withstand summary judgment. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (stating that to show there is a "genuine" issue of fact, summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts"); Omnicare, Inc. v. UnitedHealth Group, Inc., 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record."). In the absence of evidence of written notice under the Zurich E&O Policy, Exclusion A doesn't preclude coverage under the Arch E&O Policy.

Exclusion C states:

> This policy does not apply to any Claim based upon, arising out of or in any way involving any prior or pending litigation against any Insured filed on or before the inception date of this Policy or under any other policy of which this Policy is a renewal, whichever is earlier, or the same or substantially the same fact, circumstance or situation underlying or alleged therein.

As with Exclusion A, the court doesn't rely on the definition for "Related Claims" because that term doesn't appear in Exclusion C. The court instead follows the plain language of Exclusion C.

Arch argues that a plaintiff, Minson, filed a lawsuit against Amerus and Mr. Kloppe on February 22, 2008 and that Mr. Kloppe acknowledged notice of that claim as of February 22, 2008 — before the Arch E&O policy's March 1, 2008 inception date. Arch says the knowledge of Lafayette Life's agent, Mr. Kloppe, should be imputed to Lafayette Life. Arch says a question of fact exists as to the date of service of the Minson complaint and Lafayette Life's actual or presumed knowledge of it.

Arch cites no principle of law for why agent Mr. Kloppe's potential knowledge of the Minson suit against him and Amerus before March 1, 2008 should be imputed to Lafayette Life. Further, as already noted, Arch has had ample opportunity to discover any document that shows Lafayette Life knew or should have known of the lawsuit, but no such proof has surfaced. Arch has had ample opportunity to prove the lawsuit was served on Mr. Kloppe before March 1, but again, no such proof has surfaced. Arch's argument relies on inferences unsupported by any evidence that Lafayette Life knew or should have known of the Minson suit before the inception date of the policy. Metaphysical doubt isn't enough to prevent summary judgment.

Even if Arch had such proof, Arch's reading of Exclusion C as relying on the definition of "Related Claims," when that term doesn't appear in the exclusion, is

incorrect. Arch's argument ignores the exclusion's actual language, which prohibits coverage for Claims "based upon, arising out of or in any way involving any prior or pending litigation against any Insured" or involving "the same or substantially the same fact, circumstance or situation underlying or alleged therein" and filed before the inception date of March 1. That language means that the Policy doesn't cover a Claim that already has been litigated or is being litigated before the Policy's inception. Rather, the Policy covers new Claims made during the March 1, 2008 - March 1, 2009 Policy Period that don't involve "the same or substantially the same fact, circumstance or situation underlying or alleged therein."

Reasonable people can interpret "the same or substantially the same" as involving differing scopes of sameness, so those terms are ambiguous and must be interpreted in favor of coverage under these circumstances. *See* <u>Am. States Ins. Co. v. Kiger</u>, 662 N.E.2d 945, 947 (Ind. 1996) ("Where there is ambiguity, insurance policies are to be construed strictly against the insurer."). A claim filed against Mr. Kloppe and Amerus on February 22, 2008 doesn't preclude coverage because that claim isn't the same as a claim filed by a different policyholder under a different policy against an insurance company completely unrelated to Amerus. Arch has argued that the Lafayette Life claims are related to the Amerus claims. Some similarity exists in Mr. Kloppe and his conduct, but that typological relation doesn't mean the claims are all one and the same or even substantially the same, and Arch has made no argument and pointed to no evidence that the relation they

note is unambiguously sufficient to preclude coverage under the exclusion. *Cf.* Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co., 393 F.Supp.2d 693, 703 (E.D. Wis. 2005) (stating, with regard to a very similar pending litigation exclusion, that "Executive Risk cites no case supporting the proposition that a prior and pending proceeding exclusion may bar coverage for claims that bear a mere typological relationship to the prior or pending proceeding.").

In sum, Exclusion C doesn't preclude coverage because Arch has presented no evidence that the Minson/Amerus lawsuit was served before March 1, 2008, because the Lafayette Claims aren't based upon nor do they arise out of nor do they involve any of the Amerus Claims, and because the catchall sameness of circumstance proviso at the end of the exclusion is ambiguous.

## 3

Lafayette Life settled twelve claims after Arch repeatedly denied coverage for eleven of them and took no action at all on the twelfth claim (Chart, Claims 1-12). Lafayette Life settled another nine claims before even notifying Arch of those claims (Chart, Claims 13-21). Arch says Lafayette Life's conduct violated the notice and cooperation provisions of the E&O policy, relieving Arch of any coverage obligations. As to the first twelve claims, this isn't so.

Notice and cooperation obligations are conditions precedent to coverage. Miller v. Dilts, 463 N.E.2d 257, 260-261 (Ind. 1984). But notice and cooperation provisions aren't equivalent. The notice requirement is "material, and of the

22

essence of the contract." Id. at 265. But "[a]n insurance company must show actual prejudice from an insured's noncompliance with the policy's cooperation clause before it can avoid liability under the policy." Id. at 265.

On the other hand, an insurer that refuses its defense obligations is collaterally estopped from complaining it had no hand in the settlement of claims. See Frankenmuth Mut. Ins. Co. v. Williams, 690 N.E.2d 675, 678-679 (Ind. 1997); Liberty Mut. Ins. Co. v. Metzler, 586 N.E.2d 897, 900-901 (Ind. Ct. App. 1992). An insurance company that sits the game out by refusing its defense obligations "does so at its own peril." Frankenmuth Mut. Ins. Co. v. Williams, 690 N.E.2d at 679 (quotation omitted); Liberty Mut. Ins. Co. v. Metzler, 586 N.E.2d at 901.[3]

Arch argues that Lafayette Life didn't cooperate with Arch on the first twelve claims because Lafayette Life didn't forward the North Carolina lawsuit complaint to Arch after it was filed. The Policy's cooperation clause states,

> The insured shall furnish the insurer with copies of demands, reports, investigations, pleadings and related papers, and provide other such information, assistance and cooperation as the Insurer may reasonably request in the investigation, settlement and defense of a Claim.

Policy § VII.A.3. After Arch's multiple denials of coverage, Lafayette Life wrote to Arch to indicate that in light of Arch's denials, Lafayette Life would have no choice but to defend and settle the claims on its own. Arch decided not to defend the

---

[3] Collateral estoppel wouldn't prevent an insurer from pursuing coverage defenses when an insurer files a declaratory judgment action for a judicial determination of its obligations under the policy or defends the insured under a reservation of rights. See Liberty Mut. Ins. Co. v. Metzler, 586 N.E.2d 897, 902 (Ind. Ct. App. 1992).

claims at its own peril and Lafayette Life gave Arch ample opportunity to change its mind. For Arch to argue that it was blindsided by the actual filing of the North Carolina lawsuit is untenable: Arch could expect that the demand letter and Lafayette Life's warning letter would result in settlements and payouts by Lafayette Life.

The cooperation clause's plain language states that the furnishing of pleadings and other related documents is a duty that arises "as the Insurer may reasonably request," which assumes a request. Arch maintained radio silence after Lafayette Life's January 2009 letter and made no such requests. Further, the cooperation clause's clear language assumes that Arch was itself cooperating by actually engaging in the "investigation, settlement and defense of a Claim." Arch refused to investigate, defend and settle claims at its own peril. Finally, Arch presents no argument for why Lafayette Life's refund of premiums on these first twelve claims resulted in actual prejudice.

The summary judgment case is different for the last nine claims, which Lafayette Life settled without notifying Arch of their existence. Because Arch raised this issue for the first time in its response brief, and because Lafayette Life's reply acknowledges a continuing issue of material fact on these last nine claims, the court declines to issue a premature ruling concerning the notice and cooperation provisions as defenses to Arch's liability on these last nine claims. Discovery and briefing on this issue will be wrapped into discovery and briefing on the remaining issues.

# III

Lafayette Life hired what appears, according to this summary judgment record, to have been a bad apple in 2006. Others knew he was a bad apple, but no evidence exists that Lafayette Life knew it until after March 1, 2008. Attorney Baker lodged a very serious accusation of direct wrongdoing and Arch chose at its peril to treat that accusation as though it were an established fact. In the end, nothing in the record provides anything beyond a metaphysical doubt that Lafayette Life had any knowledge of or anything to do with Mr. Kloppe's deceptive sales practices. Mr. Kloppe deceived wealthy and sophisticated investors; without any proof material to the terms of the Policy that Lafayette Life knew or should have known what was going on, the only acceptable inference is that Mr. Kloppe deceived Lafayette Life as well. Arch smelled a rat, but neither then nor now has it come forward with anything to justify its breach of contract on the basis of an exaggerated accusation.

Arch breached its contract with Lafayette Life, and Exclusions A and C don't operate to exclude coverage here. As to claims 1-12, Lafayette Life properly cooperated with Arch and Arch is liable to Lafayette Life on those claims. As to claims 13-21, further discovery and briefing is required to determine the applicability of the notice and cooperation clauses of the contract to those claims.

The court GRANTS Lafayette Life's motion for partial summary judgment on the question of Arch's breach of contract [Doc. No. 16]. Further proceedings will involve the following remaining issues: (1) Applicability of notice and cooperation

clauses, Policy §§ VII.A.1 and VII.A.3, as defenses to claims 13-21 (Brooke, Blankenhorn, Hertzog, Ivady, Flint, C. Lanier, M. Lanier, Gouck, and Dunn); (2) Lafayette Life's claim of tortious bad faith; and (3) Damages.

SO ORDERED.

ENTERED: March 21, 2011

/s/ Robert L. Miller, Jr.
Judge
United States District Court

**APPENDIX**

| Claim No. | Name | NC Suit filed Feb. '09 | Policy Issue Date | Claim to Lafayette Life (awareness) | First Claim to Arch (pre-demand letter) | Claim to Arch (post demand letter) | Arch denial | Claim settled | Settlement Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Burda | y | 7/6/06 | 8/8/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/11/09 | $67,751.32 |
| 2 | Chapman | y | 9/19/06 | 6/2/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $110,759.11 |
| 3 | Crumley | y | 11/27/07 | 7/2/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $37,386.28 |
| 4 | DiFloure, J. | y | 9/19/07 | 8/20/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $31,108.78 |
| 5 | Lathan | y | 8/27/07 | 5/6/08 | 9/11/08 | 10/29/08 | 11/17/08 | 3/10/09 | $16,711.00 |
| 6 | Lobbestael | y | 1/16/08 | 7/10/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $17,833.55 |
| 7 | Sanchez, H. | y | 1/25/08 | 6/2/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/11/09 | $16,210.84 |
| 8 | Sanchez, T. | y | 11/2/07 | 6/2/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/11/09 | $21,682.11 |
| 9 | Yeakey | y | 6/8/06 | 5/13/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $77,078.84 |
| 10 | Upham | y | 7/19/06 | 3/26/08 | 9/11/08 | 10/29/08 | 11/19/08 | 3/10/09 | $93,684.25 |
| 11 | DiFloure, C. | y | 11/6/06 | 10/6/08 | -- | 10/29/08 | 11/19/08 | 3/11/09 | $21,762.68 |
| 12 | Blake | y | 7/25/06 | 11/12/08 | -- | 11/15/08 | NO ACTION | 3/12/09 | $108,351.20 |
| 13 | Brooke | n | 12/3/07 | 4/18/08 | -- | 10/29/08 | NO ACTION | 6/5/08 | $58,908.47 |
| 14 | Blankenhorn | n | 9/5/07 | 4/10/08 | -- | 10/29/08 | NO ACTION | 5/10/08 | $477,983.66 |
| 15 | Hertzog | n | 3/26/07 | 5/2/08 | -- | 10/29/08 | NO ACTION | 6/5/08 | $15,000.99 |
| 16 | Ivady | n | 10/1/07 | 5/2/08 | -- | 10/29/08 | NO ACTION | 6/20/08 | $3,579.38 |
| 17 | Flint | n | 6/13/06 | 9/5/08 | -- | 11/20/08 | NO ACTION | 9/30/08 | $105,999.76 |

| 18 | Lanier, C. | n | 9/28/06 | 8/18/08 | -- | 12/9/08 | NO ACTION | 9/8/08 | $105,489.28 |
| 19 | Lanier, M. | n | 9/28/06 | 8/18/08 | -- | 12/9/08 | NO ACTION | 9/8/08 | $99,999.88 |
| 20 | Gouck | n | 6/1/06 | 10/24/08 | -- | 12/12/08 | NO ACTION | 11/19/08 | $60,000.00 |
| 21 | Dunn | n | 7/11/06 | 6/6/09 | -- | 2/1/10 | 3/1/10 | 9/4/09 | $122,854.28 |